FILED
CLERK, U.S. DISTRICT COURT
3/10/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_VAM\_\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 2:22-cr-00080-MCS |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 371: Conspiracy to Operate an Illegal Gambling Business; 26 U.S.C. § 7206(1): Subscribing to a False Tax Return; 18 U.S.C. § 1955(d) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| WAYNE JOSEPH NIX and EDON YOSHIDA KAGASOFF, | |
| Defendants. | |

The United States Attorney charges:

COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A. INTRODUCTORY ALLEGATIONS

At times relevant to this Information:

1. The operation of a sports gambling business in California was prohibited by 18 U.S.C. § 1955 and California Penal Code § 337a.

2. Defendant WAYNE JOSEPH NIX was a resident of Orange County, California. Defendant NIX was a minor league baseball player from 1995 to 2001.

3. Defendant EDON YOSHIDA KAGASOFF was a resident of Orange County, California.

4.   Sometime after 2001, defendant NIX began operating a bookmaking business in the Los Angeles area that accepted and paid off bets from bettors in California and elsewhere in the United States on the outcomes of sporting events at agreed-upon odds (the "Nix Gambling Business").  Through contacts he had developed during his own career in professional sports, defendant NIX would create a client list of current and former professional athletes, and others.

5.   Defendant NIX used agents to expand the Nix Gambling Business. Agents were persons who placed and accepted bets from others for the Nix Gambling Business.

  a.   Agents recruited and maintained their own bettors within the Nix Gambling Business.

  b.   In some instances, defendant NIX would agree to bear the risk of paying, or covering, any money won by Agents' bettors as a result of their wagers.  In turn, defendant NIX would receive the majority of the money these bettors lost as a result of their wagers, and he would share with the Agents a portion of the money he so received.

  c.   In other instances, defendant NIX would agree that the Agents would bear the risk of paying, or covering, any money won by Agents' bettors as a result of their wagers.  In turn, the Agents would receive the majority of the money these bettors lost as a result of their wagers, and the Agents would pay defendant NIX a fee per player per week.

  d.   Defendant NIX recruited agents from his current roster of bettors by offering them a commission for new bettors.  Defendant NIX also recruited agents from competing bookmakers by offering the agents a larger commission and lower fees.

6. Agents #1, #2, and #3 were each a former professional baseball player who had played in Major League Baseball ("MLB"). Agent #4 was a former minor league baseball player.

7. Sand Island Sports operated Internet sports gambling websites, including www.sandislandsports.com and www.betprestige.com, hosted on servers primarily located outside the United States. Sand Island Sports also operated toll-free telephone services (hereinafter, the "call center") to facilitate sports betting. The Sand Island Sports websites and call center facilitated unlawful sports gambling by providing a platform to bookmakers to track bets placed by their clients.

8. Sand Island Sports was based in Costa Rica, and was owned and operated by United States citizens.

B.   OBJECT OF THE CONSPIRACY

9. Beginning in 2014 and continuing through on or about February 7, 2020, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants NIX and KAGASOFF knowingly conspired with each other and others known and unknown to the United States Attorney to conduct, finance, manage, supervise, direct, and own an illegal gambling business, in violation of California Penal Code Section 337a, which business involved at least five persons who conducted, financed, managed, supervised, directed, and owned all or part of the business; had been in substantially continuous operation by at least five persons for a period in excess of thirty days; and had gross revenue of more than $2,000 in a single day, all in violation of Title 18, United States Code, Section 1955(a).

C. THE MANNER AND MEANS OF THE CONSPIRACY

10. The object of the conspiracy was carried out, and to be carried out, in substance, as follows:

    a. Beginning in 2014, defendant KAGASOFF would work for the Nix Gambling Business as an agent. Defendant KAGASOFF would place and accept bets from others and help defendant NIX maintain the Nix Gambling Business by, among other things, demanding and collecting money owed to the Nix Gambling Business by bettors and others.

    b. Agents #1, #2, #3, and #4 would each be an agent of the Nix Gambling Business.

    c. As part of the Nix Gambling Business, defendants NIX and KAGASOFF, and other co-conspirators known and unknown working at defendants NIX and KAGASOFF's direction, would use the Sand Island Sports websites and call center to create accounts through which wagers would be placed and tracked, and set credit limits for bettors.

    d. Defendants NIX and KAGASOFF, and other co-conspirators known and unknown working at defendants NIX and KAGASOFF's direction, would provide bettors account numbers and passwords for the Sand Island Sports website, and directed the bettors to use the Sand Island Sports websites to place bets with the Nix Gambling Business.

    e. Bettors would place bets online through the Sand Island Sports websites, through the Sand Island Sports call center, through defendants NIX and KAGASOFF, and through the agents.

    f. Defendants NIX and KAGASOFF, and other co-conspirators known and unknown working at defendants NIX and KAGASOFF's direction, would pay winnings to, and collect losses from, the bettors, and in

doing so would receive more than $2,000 in gross revenue in a single day.  In all instances, the NIX Gambling business, rather than Sand Island Sports, paid the winnings to the bettors and retained almost all of the money collected from bettors as a result of their losses.

    g. In exchange for use of the Sand Island Sports website and call center, defendant NIX paid a fee to Sand Island Sports for each active bettor.

D. OVERT ACTS

  11. In furtherance of the conspiracy, and to accomplish its object, on or about the following dates, defendants NIX and KAGASOFF committed and willfully caused others to commit various overt acts within the Central District of California, and elsewhere, including, but not limited to, the following:

  Overt Act No. 1: On January 7, 2016, defendant NIX received a check for $245,000 from a professional football player for gambling losses incurred by the football player.

  Overt Act No. 2: On May 31, 2016, defendant NIX received $4,000 from a coach in MLB for gambling losses incurred by the coach.

  Overt Act No. 3: On November 18, 2016, by text message, defendant NIX recruited a former professional football player to be an agent of the Nix Gambling Business by telling him to handle the communications with two new bettors participating in the Nix Gambling Business and agreeing to pay the former professional football player a "commission" on the losses of the two new bettors.

  Overt Act No. 4: On January 30, 2017, by text message, defendant KAGASOFF told Agent #1 that Agent #1 owed $2,318 for his personal gambling losses and provided balances, i.e., total amounts due, for two of Agent #1's clients.

Overt Act No. 5: On April 1, 2017, by text message, defendant KAGASOFF provided a former professional baseball player the Sand Island Sports website address and an account number, and told him that the maximum wager he could place on a game was $25,000.

Overt Act No. 6: On July 8, 2017, by text message, defendant KAGASOFF told Agent #2 that defendant KAGASOFF would call defendant NIX to discuss a potential loan for Agent #2 to enable Agent #2 to pay winnings to a client who wagered $1 million annually with the Nix Gambling Business through Agent #2, and Agent #2 agreed to let defendant KAGASOFF drive Agent #2's Ferrari for a month if defendant KAGASOFF was able to convince defendant NIX to lend him the money.

Overt Act No. 7: On November 5, 2018, by telephone, defendant NIX advised Agent #3 to get rid of clients who did "prop betting" after Agent #4 told defendant NIX that he had lost $10,000 on a client of the Nix Gambling Business who refused to pay.

Overt Act No. 8: On December 11, 2018, defendant NIX received an $8,000 wire transfer for gambling losses from a baseball analyst.

Overt Act No. 9: On January 12, 2019, by text message, defendant KAGASOFF agreed to meet Agent #4 later that day to collect money that Agent #4 had collected from a client.

Overt Act No. 10: On January 24, 2019, by telephone, defendant NIX told a client that he was throwing a Super Bowl party for clients of the NIX Gambling Business, and that he had invited a former NBA player and Hawaiian Tropic girls.

Overt Act No. 11: On February 3, 2019, defendant NIX accepted a $5 million bet from a client of the NIX Gambling Business on the outcome of the Super Bowl.

6

Overt Act No. 12: On February 23, 2019, by text message, defendant NIX agreed to reactivate the account of a sports broadcaster after the sports broadcaster told defendant NIX that he was refinancing his home mortgage to obtain money to pay his outstanding gambling debt to defendant NIX.

Overt Act No. 13: Responding to a request from a professional baseball player who already owed gambling debts to defendant NIX, on September 14, 2019, by text message, defendant NIX agreed to increase the baseball player's credit limit to allow the baseball player to wager additional sports bets.

Overt Act No. 14: On November 15, 2019, by text message, defendant KAGASOFF told a business manager for a professional basketball player that defendant KAGASOFF would increase the maximum dollar amount the business manager could wager on "NBA games" to $25,000 per game.

COUNT TWO

[26 U.S.C. § 7206(1)]

[DEFENDANT NIX]

On or about October 11, 2019, in Orange County, within the Central District of California, and elsewhere, defendant WAYNE JOSEPH NIX, a resident of Orange County, California, willfully made and subscribed to a materially false United States Individual Income Tax Return, Form 1040, for tax year 2018, which was verified by a written declaration that it was made under the penalties of perjury, and which was filed with the Internal Revenue Service, which return defendant NIX did not believe to be true and correct as to every material matter, in that defendant NIX reported, on line 10, that his taxable income for calendar year 2018 was $1,724,552, when, in fact, as defendant NIX then knew, his taxable income for the year 2018 was substantially higher than that amount.

FORFEITURE ALLEGATION

[18 U.S.C. § 1955(d) and 28 U.S.C. § 2461(c)]

12. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 1955(d) and Title 28, United States Code, Section 2461(c), in the event of any defendants' conviction of the offense set forth in Count One of this Information.

13. The defendants, if so convicted, shall forfeit to the United States of America the following:

(a) Any property, including money, used in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

14. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendants, if so convicted, shall forfeit substitute property, if, by any act or omission of such defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the

//
//
//

jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

TRACY L. WILKISON
United States Attorney

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

MONICA E. TAIT
Assistant United States Attorney
Deputy Chief, Major Frauds Section

JEFF MITCHELL
Assistant United States Attorney
Major Frauds Section

DAN G. BOYLE
Assistant United States Attorney
Asset Forfeiture Section